NOTICE
Decision filed 11/08/19. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2019 IL App (5th) 170098-U

NO. 5-17-0098

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Effingham County. |
| | ) | |
| v. | ) | No. 15-DT-195 |
| | ) | |
| KELSEY L. AGNEY, | ) | Honorable |
| | ) | Kimberly G. Koester, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Overstreet and Justice Welch concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the defendant's conviction and sentence for misdemeanor driving under the influence of alcohol because the independent corroborating evidence presented at her trial prevents her conviction from running afoul of the *corpus delicti* rule.

¶ 2    The defendant, Kelsey L. Agney, appeals her conviction and sentence, following a trial by jury, for misdemeanor driving under the influence of alcohol. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On November 13, 2015, the defendant was charged, by a complaint filed in the circuit court of Effingham County, with driving under the influence of alcohol in violation of section 11-501(a)(2) of the Illinois Vehicle Code (625 ILCS 5/11-501(a)(2)

1

(West 2014)), a Class A misdemeanor. On October 3, 2016, the defendant was charged, by information, with the same offense, which was alleged to have occurred on November 12, 2015, on Illinois Highway 32. A jury trial was held on October 3, 2016.

¶ 5     The first witness to testify at trial was Deputy Travis Buhnerkempe of the Effingham County Sheriff's Office. He testified that on November 12, 2015, at approximately 10:30 p.m., he was on patrol in the same vehicle as Deputy Ted Heath. The deputies were dispatched to investigate a "suspicious subject" near Illinois Highway 32 and 2000th Avenue in "far north" Effingham County. When the deputies arrived in the area, Buhnerkempe observed a blue Chevrolet Impala "on the west ditch[,] facing southbound." He described the area as "kind of a shallow ditch so you can pull off into the grassy area," and noted that the Impala "was probably ten feet off the actual lane of travel." He testified that there were two occupants in the vehicle: the defendant, who was in the passenger seat, and Hope Boehm, who was in the driver's seat. He testified that he made contact with the defendant—whom he identified in court—and asked her how the vehicle "came to be where it was." Buhnerkempe testified that the defendant told him that they were "en route to a party in Effingham from Shelbyville" before running out of gas, and that the defendant had been driving prior to running out of gas. He noticed the odor of alcoholic beverages coming from the vehicle, and noticed that the defendant's "eyes were bloodshot and watery and her speech was slightly slurred."

¶ 6     Buhnerkempe testified that he subsequently conducted a license check, because the defendant and Boehm had told him that someone was bringing them gas for the car, and he wanted to make sure there would be a licensed driver to drive the vehicle away

2

from the area. From his license check, he learned that Boehm's license was suspended, but that the defendant's was valid. He testified that when he returned to the vehicle, his "intentions were to ask [the defendant] to submit to field sobriety testing based on her admission to being in control of the vehicle and the fact that I assumed she was possibly impaired." He noted that the defendant "had initially told me that she had in fact drank [*sic*] some alcohol, when I inquired about the odor, but she said that it was while she was at home prior to leaving." He testified that when he asked her to perform field sobriety tests, "she started to get disgruntled because she wasn't driving." He described the defendant as belligerent and "[u]sing curse words while we conversed," and added that the defendant "was cooperating, but she was voicing her displeasure about cooperating."

¶ 7    Buhnerkempe then testified about field sobriety testing in general, as well as his training and experience conducting such testing in the field. He testified about conducting three separate field sobriety tests with the defendant, as well as her response to each test. He testified that after the tests, he placed the defendant under arrest for DUI, and thereafter placed her in the back of the patrol car. When he saw the defendant "getting her cell phone out," he asked her for the phone. Buhnerkempe testified that the defendant threw the phone out of the car, and that after it hit the ground, the defendant stated to Buhnerkempe, "pick it up bitch." He testified that when he conducted an inventory search of the defendant's vehicle, he found the keys in the back seat, but "didn't find anything" else. He testified about his training, certification, and experience administering tests on a breath analyzer machine, and testified that he administered a test to the defendant at the police station. He testified that her result was ".133."

3

¶ 8    Buhnerkempe was then asked if he had "additional conversations" with the defendant after administering the test. He answered yes, and testified that the defendant told him she had consumed "[t]hree to four Bud Lights" at her uncle's home in Shelbyville, and then had driven the car toward Effingham. He testified that the patrol car he was using on November 12, 2015, was equipped with audio and video recording equipment, discussed how it functioned, and testified that on that night, "[t]here was no audio unless you were inside the car." He authenticated an approximately 15-minute-long DVD recording from that night, which was admitted into evidence as People's Exhibit 5, then published to the jury and viewed by them.

¶ 9    On cross-examination, Buhnerkempe testified that he received the dispatch about the defendant's vehicle at approximately 10:30 p.m., but did not arrive at the vehicle until sometime between 11 and 11:30 p.m. He testified that the defendant's seat was "laid back" when he approached the vehicle, and that he presumed the defendant was sleeping. He conceded that it was "possible" that the defendant's bloodshot eyes and slightly slurred speech were the result of her just waking up. He testified that the defendant told him that she had consumed alcohol in Shelbyville, and had also consumed alcohol "roadside" after the car ran out of gas. He testified that a full, unopened bottle of "strawberry daiquiri" was found in the car, and that he did not find any empty alcohol containers in the car or outside of the car "on the passenger side." He testified that he did not look in the field near the car for empty alcohol containers. He testified that after arriving at the police station, he read the defendant her *Miranda* rights at 12:24 a.m. On redirect examination, Buhnerkempe testified that he asked the defendant where the empty

4

containers from her "roadside" drinking were, and she produced the full container of strawberry daiquiri, but did not produce any empty containers. He testified that he "specifically was looking for [empty containers] to corroborate *** what she had told" him. On recross-examination, he conceded that in his written report—which he testified would have been completed "[u]sually either the day of or within a couple days"—he had indicated that the defendant told him that she threw away the empty alcohol containers.

¶ 10    The next witness to testify was Deputy Heath. His testimony was consistent with that of Deputy Buhnerkempe with regard to the basic facts of the interaction between the deputies and the defendant. Of relevance to this appeal, he testified that while at the defendant's vehicle, he "smelled classic odor of alcoholic beverage and the defendant had the signs that were consistent with a person who had been consuming alcohol on quite some level." Following Heath's testimony, the State rested.

¶ 11    The defendant testified next. She testified that on November 12, 2015, she attended a family gathering at her uncle's home where they drank "a few beers" before she left at approximately 8 p.m. Upon further questioning by her attorney, the defendant testified that she had "about two Bud Lights" at her uncle's home. She testified that she drove Boehm toward Effingham at "[r]oughly 8:00. In between 8:15 and 8:30." Her car ran out of gas, and she and Boehm "sat in the car for awhile." Because she was upset, the defendant "started drinking the alcohol we got for the party" in Effingham. She testified that in the trunk of her car, she "had about a 12-pack of Bud Light bottles," Boehm had "Smirnoff Bacardi Koozies," and that the defendant also "had a bottle of Moonshine." She testified their cell phones were "dead," and that the charger in her car was

5

inoperable. After approximately an hour, they decided to walk to a nearby house to try to call a friend to pick them up. She described the weather as "freezing *** very cold and *** very windy." She testified that she drank Bud Light bottles as she and Boehm walked to the nearest house, which she estimated was "about half a mile" away from their disabled vehicle.

¶ 12    The defendant testified that the occupant of the nearest house would not let them in or let them use his phone, and asked them to leave his property, which they did. They returned to the car and she drank more alcohol. After warming up, they walked down the road to the next house, which she testified was "about a mile and a half down the road." There, she used the phone to call her best friend to come get her. She testified that she and Boehm again returned to the disabled car, where the defendant fell asleep. Boehm awakened her to tell her the police had arrived, at which point the defendant "sat up and opened up [her] door." She testified that she was sitting in the passenger seat because she was drinking and Boehm was not. She testified that she told the police officer that she had driven the car to the location where it ran out of gas. She then testified as follows:

> "I told him instantly I did not drink before I drove this car here. I sat in this car and drank. And he asked me where my containers were. I told them that I littered them on the side of the road and I was instantly arrested for it."

She testified she had containers "at the car and along the roadside where we had walked." She testified that she put her empty containers in the trunk of the car, and "in a field right next to my car and along the roadway." She testified that the deputies did not search for the empty containers. Asked how much she drank after the car ran out of gas, the

6

defendant testified, "I cannot estimate the alcohol in the Moonshine, but the Bud Light bottles, I had about five to six, seven." On cross-examination, the defendant conceded that she never told the deputies that there were alcohol containers in the trunk of the car.

¶ 13    Following the defendant's testimony, the defense rested, and the State called Buhnerkempe in rebuttal. He testified that his inventory search of the defendant's car would have included the trunk. He could not independently recall if he found alcohol or alcohol containers in the trunk, but testified that he would have written it down if he had. In closing argument, the defendant's counsel contended that the alcohol the defendant consumed prior to driving did not cause her to be intoxicated, and that to the extent she was intoxicated when she encountered the deputies, it was because she consumed more alcohol after the car ran out of gas—at which point she was not driving, and did not drive again, the car. Following its deliberations, the jury found the defendant guilty of driving under the influence of alcohol.

¶ 14    On October 6, 2016, the defendant filed a motion for a new trial, in which her sole contention was that the State had failed to prove her guilty beyond a reasonable doubt. The motion was denied on March 16, 2017. On that same day, following a sentencing hearing, the defendant was sentenced to 24 months of probation, along with certain conditions, and subsequently was assessed fees, fines, and other costs. This timely appeal followed.

¶ 15                                    II. ANALYSIS

¶ 16    On appeal, the defendant's sole contention is that her conviction "should be reversed because the State failed to prove, under the *corpus delicti* rule, that she was

7

under the influence of alcohol while driving." Although the defendant did not raise this issue specifically in the trial court—instead contending in that tribunal only that the State did not prove her guilty beyond a reasonable doubt—the State does not claim that the defendant's contention on appeal is forfeited. We therefore turn to the merits of her claim.

¶ 17    In *People v. Lara*, 2012 IL 112370, the Illinois Supreme Court clarified, as a matter of law, the principles pertinent to an analysis of a defendant's claim, following a trial by jury, that the defendant's conviction violates the *corpus delicti* rule. The court first noted the well-established general rule that "[t]he *corpus delicti* of an offense is simply the commission of a crime," and that it, along with the identity of the perpetrator of the crime, must be proven beyond a reasonable doubt for a conviction to be valid. *Id.* ¶ 17. The court added that as a general proposition, "*corpus delicti* cannot be proven by a defendant's admission, confession, or out-of-court statement alone" because when a confession constitutes "part of the *corpus delicti* proof, the State must also provide independent corroborating evidence." *Id.* However, the court added:

> "the independent evidence need only *tend to show* the commission of a crime. It need not be so strong that it alone proves the commission of the charged offense beyond a reasonable doubt. If the corroborating evidence is sufficient, it may be considered, together with the defendant's confession, to determine if the State has sufficiently established the *corpus delicti* to support a conviction." (Emphasis in original.) *Id.* ¶ 18.

8

The court subsequently noted that the *corpus delicti* rule derives from our "courts' historical mistrust of out-of-court confessions," which can be attributed in general to the tendency of some people "to confess, for various psychological reasons, to offenses that they did not commit or that did not occur," as well as to situations where the confessions may have been coerced and therefore are unreliable. *Id.* ¶ 19.

¶ 18 The *Lara* court thereafter ruled that prior precedent from the court "may be properly read to support the general rule that corroboration is not compulsory for each element of every alleged offense" (*id.* ¶ 26) and likewise "that the *corpus delicti* rule does not universally mandate corroboration of every element of every charged offense" (*id.* ¶ 30). Moreover, the independent corroborating evidence does not have to "disprove the possibility that no" offense occurred. *Id.* ¶ 41. The court noted its longstanding rejection of the notion that there must be "an *exact match* between the independent evidence and the details in the defendant's confession." (Emphasis in original.) *Id.* ¶ 42. To the contrary, what is required is merely some consistency between the two which tends " 'to confirm and strengthen the confession.' " *Id.* (quoting *People v. Furby*, 138 Ill. 2d 434, 451-52 (1990)). The court noted its previous ruling that alleged discrepancies between the two do " 'not necessarily create inconsistencies.' " *Id.* ¶ 43 (quoting *People v. Willingham*, 89 Ill. 2d 352, 363 (1982)). The court added that, when viewed together, its prior cases on this issue "establish that corroboration is sufficient to satisfy the *corpus delicti* rule if the evidence, or reasonable inferences based on it, tends to support the commission of a crime that is at least closely related to the charged offense." *Id.* ¶ 45.

9

In addition, "[c]orroboration of only some of the circumstances related in a defendant's confession is sufficient." *Id.*

¶ 19 The *Lara* court reiterated the well-established axiom that "the trier of fact alone is entrusted with the duties of examining the evidence and subsequently determining whether the State has met its burden of proving the elements of the charged offense beyond a reasonable doubt." *Id.* ¶ 46. The court noted that the trier of fact's job "is to evaluate the credibility of the witnesses, weigh the conflicting evidence, draw reasonable inferences, resolve evidentiary conflicts to determine the facts, and, finally, to apply the law as instructed to arrive at a verdict." *Id.* The court added that one of the things "[i]nherent in those responsibilities is the need to consider a variety of evidence, some conflicting or unclear, addressing the *corpus delicti*, the identity of the offender, or both." *Id.* The court then examined again some of the relevant public policy considerations, noting, *inter alia*, that "[s]etting the bar too high for finding sufficient corroboration of a defendant's confession under the *corpus delicti* rule would intrude on the scope of the fact finder's exclusive duties," and adding that "[a]s long as the confession is reasonably reliable, consideration of it and all the other evidence properly admitted at trial falls within the domain of the trier of fact." *Id.* ¶ 47. The court further ruled that the independent corroborating evidence presented "need not precisely align with the details of the confession on each element of the charged offense, or indeed to any particular element of the charged offense." *Id.* ¶ 51.

¶ 20 Applying the *Lara* principles to the case on appeal, we conclude that the defendant's conviction does not run afoul of the requirements of the *corpus delicti* rule.

We first note that this case does not involve an out-of-court confession, or a "confession" at all for that matter. Accordingly, it is questionable whether the *corpus delicti* rule even applies to the facts of this case, in light of the public policy reasons, discussed above, that led to the creation of the rule in the first place. However, assuming *arguendo* that the rule applies, and indulging the defendant's arguments related thereto, we still, for the following reasons, find the defendant's contention to be without merit. The evidence presented to the jury at the defendant's trial is described in detail above. Of significance to the defendant's *corpus delicti* argument, the defendant contends, *inter alia*, that "the only evidence" that the defendant drove under the influence of alcohol prior to running out of gas consisted of the defendant's "uncorroborated admissions." We do not agree with this overly-narrow characterization of the evidence. As the State points out, in addition to the defendant's trial testimony that she attended a family gathering at her uncle's home where they drank "a few beers" (as noted above, upon further questioning by her attorney, the defendant testified that she had "about two Bud Lights" at the home), and Buhnerkempe's testimony that the defendant told him she consumed "[t]hree to four Bud Lights" at the home and then drove the car toward Effingham, the jury was presented with evidence, in the form of testimony from both Buhnerkempe and Heath, that there was an odor of alcoholic beverages in the car and that the defendant appeared to be intoxicated when they arrived on the scene. The jury was also presented with testimony, and with video evidence via People's Exhibit 5, that no empty alcohol containers were present in the immediate vicinity of the disabled vehicle. Although it is true that the defendant could have become intoxicated after running out of gas, and could have

"littered" her empty containers in other locations or stored them in the trunk, as she variously testified, this was not the only reasonable possibility, and the jury was not required to believe the defendant's theory rather than the State's theory.

¶ 21    As explained above, "the trier of fact alone is entrusted with the duties of examining the evidence and subsequently determining whether the State has met its burden of proving the elements of the charged offense beyond a reasonable doubt." *Lara*, 2012 IL 112370, ¶ 46. The trier of fact's job "is to evaluate the credibility of the witnesses, weigh the conflicting evidence, draw reasonable inferences, resolve evidentiary conflicts to determine the facts, and, finally, to apply the law as instructed to arrive at a verdict." *Id*. One of the things "[i]nherent in those responsibilities is the need to consider a variety of evidence, some conflicting or unclear, addressing the *corpus delicti*, the identity of the offender, or both." *Id*. Moreover, "[s]etting the bar too high for finding sufficient corroboration of a defendant's confession under the *corpus delicti* rule would intrude on the scope of the fact finder's exclusive duties," and "[a]s long as the confession is reasonably reliable, consideration of it and all the other evidence properly admitted at trial falls within the domain of the trier of fact." *Id*. ¶ 47. The independent corroborating evidence presented "need not precisely align with the details of the confession on each element of the charged offense, or indeed to any particular element of the charged offense." *Id*. ¶ 51.

¶ 22    In this case, a reasonable inference to be drawn by the jury from the fact that the defendant was intoxicated when the police arrived, and from the fact that no empty alcohol containers were found by the police in or around the vehicle—despite

12

Buhnerkempe's attempt to corroborate the defendant's story about drinking after the vehicle became disabled—was that all of the drinking the defendant did on the night in question occurred at her uncle's home, prior to her driving the car toward Effingham. Indeed, the mere fact that the defendant allowed her car to run out of gas supports a reasonable inference by the jury, in light of the evidence of the defendant's drinking prior to driving, that she was too impaired while operating the car to even notice that she needed to get gas. In light of the defendant's imprecise testimony with regard to how much she drank at her uncle's house—and for that matter, how much she purportedly drank after the car became disabled—as well as her imprecise testimony with regard to what happened to the alleged empty alcohol containers (and for that matter, the alleged remaining full bottles from the "12-pack of Bud Light bottles" she claimed to possess) in the area of the disabled car, it was well within the province of the jury to find the defendant a less-than-credible witness, and to accept the State's theory of the case over hers.

¶ 23    With regard to the defendant's argument that the State failed to offer evidence other than the defendant's admission to prove the first element of the offense—that the defendant drove the car on the night in question—as explained above, *Lara* specifically states that under the *corpus delicti* rule, "corroboration is not compulsory for each element of every alleged offense" (2012 IL 112370, ¶ 26) and likewise "that the *corpus delicti* rule does not universally mandate corroboration of every element of every charged offense" (*id*. ¶ 30). To the contrary, "the independent evidence need only *tend to show* the commission of a crime. It need not be so strong that it alone proves the

13

commission of the charged offense beyond a reasonable doubt." (Emphasis in original.) *Id.* ¶ 18. Moreover, the independent corroborating evidence does not have to "disprove the possibility that no" offense occurred. *Id.* ¶ 41. There is no requirement of "an *exact match* between the independent evidence and the details in the defendant's confession." (Emphasis in original.) *Id.* ¶ 42. To the contrary, what is required is merely some consistency between the two which tends " 'to confirm and strengthen the confession.' " *Id.* (quoting *Furby*, 138 Ill. 2d at 451-52). Alleged discrepancies between the two do " 'not necessarily create inconsistencies.' " *Id.* ¶ 43 (quoting *Willingham*, 89 Ill. 2d at 363). Prior cases from the Illinois Supreme Court "establish that corroboration is sufficient to satisfy the *corpus delicti* rule if the evidence, or reasonable inferences based on it, tends to support the commission of a crime that is at least closely related to the charged offense." *Id.* ¶ 45. In addition, "[c]orroboration of only some of the circumstances related in a defendant's confession is sufficient." *Id.* The *Lara* principles are met by the evidence presented in this case.

¶ 24    The defendant also asks this court to consider *People v. Wells*, 103 Ill. App. 2d 128 (1968), in support of her *corpus delicti* argument. *Wells*, however, is a two-page, rather perfunctory, 1968 decision from this court involving a bench trial and a reasonable doubt—rather than *corpus delicti*—analysis, and contained no admissions from the defendant that he had been drinking prior to his car accident, and no corroborating evidence in support of the theory that he had been drinking prior to his car accident. *Lara* is far more detailed, far more apposite, and far better reasoned; it is also from the Illinois Supreme Court, and accordingly dictates our result.

¶ 25                          III. CONCLUSION

¶ 26    For the foregoing reasons, we affirm the defendant's conviction and sentence.


¶ 27    Affirmed.